IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | x | |
| UNITED STATES OF AMERICA | : | |
| | : | |
| -vs- | : | |
| | : | |
| | : | Case No. 19-cr-10080-NMG |
| | : | |
| MANUEL HENRIQUEZ, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | x | |

## MANUEL HENRIQUEZ'S SENTENCING MEMORANDUM

Leave to File Under Seal and Excess Pages Granted on February 19, 2020 [Dkt. 858]

## REDACTED VERSION

# TABLE OF CONTENTS

I.      Manuel Henriquez's Personal History ............................................................... 2

        A.      Background ............................................................................................. 2

        B.      Mr. Henriquez's Family ........................................................................ 6

        C.      Aside from the Charged Offenses, Mr. Henriquez Has Lived an Exemplary,
                Charitable, and Ethical Life, and Always Strived to Better his Community .......... 8

II.     Mr. Henriquez's Crimes and Regret ............................................................... 14

III.    A Sentence at the Low End of the 0- to 6-Month Guidelines Range Meets the
        Objectives of the Sentencing Guidelines and Relevant Statutory Authority ................... 15

        A.      Guideline 2B1.1 Applies and Probation Correctly Determined Mr. Henriquez's
                Sentencing Guidelines Range to be 0 to 6 Months ................................................. 15

        B.      Mr. Henriquez Played A Relatively Minor Role in the Offense ........................... 16

                1.      Mr. Henriquez Did Not Abuse A Position of Trust ................................. 16

                2.      Mr. Henriquez Did Not Recruit His Children into the Scheme ............... 18

                3.      Mr. Henriquez Did Not Play An "Active Role" in the Offense ............... 18

                4.      The Tax Deduction Does Not Evidence Enhanced Culpability ............... 19

        C.      Mr. Henriquez Has Fully Accepted Responsibility for his Conduct .................... 20

        D.      Mr. Henriquez's Sentence Should Account for His Lifetime of Charitable
                Works ........................................................................................................ 22

        E.      Mr. Henriquez's Sentence Should Accord with Those Imposed Upon Other
                Similarly-Situated Defendants .......................................................................... 22

IV.     Mr. Henriquez's Sentence Should Reflect His Unique Health Circumstances ............... 26

V.      Mr. Henriquez Requests that He and His Wife Elizabeth Serve Staggered Sentences .... 27

VI.     Conclusion ............................................................................................... 28

Manuel Henriquez stands before this Court for sentencing, having pleaded guilty to the two-count indictment against him.  As correctly determined by the United States Probation Office ("Probation"), his United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range is 0 to 6 months.  Mr. Henriquez takes full responsibility for his crimes and is deeply remorseful for his actions and for the pain and suffering he has caused his family and the many students who sought admission to college on their own merits.

The government requests a jail sentence of 5 months imprisonment.[1]  This requested sentence is excessive, would not reflect Mr. Henriquez's level of culpability, and is discordant with the sentences imposed upon or recently recommended for similarly-situated parent defendants.  Mr. Henriquez's role in the offense was minor.  And, with the exception of this crime, which he does not seek to minimize, Mr. Henriquez has lived an exemplary life, overcoming childhood poverty and abuse, conquering his own learning disabilities, building a successful career and company that employed over 100 people, nurturing a loving family, and dedicating an enormous amount of his personal time to advocating for and helping children with learning and behavioral disabilities and life-threatening illnesses.  Given all the facts and circumstances here, and as described in more detail below, we believe that a sentence at the low end of the 0- to 6-month Guidelines range is just and fair, meets the objectives of the federal sentencing framework set out in the Sentencing Guidelines and Title 18, United States Code, Section 3553(a), and is consistent with the government's sentencing recommendation in factually analogous cases.

---

[1] Although the government initially requested 18 months' imprisonment for Mr. Henriquez, it recently advised Mr. Henriquez's counsel that it intends to revise its request to 5 months.

## I.    Manuel Henriquez's Personal History

### A.    Background

Brought to the United States at just a few months old, by an immigrant mother seeking refuge from domestic violence and a better life for her three children, Mr. Henriquez built his life into the American Dream.  Mr. Henriquez was born in the Dominican Republic in 1963.  His father was an alcoholic who was unable to sustain a job and abused his wife and children.  When Mr. Henriquez was a few months old, his parents separated, and his mother fled with Mr. Henriquez and his two sisters to Florida to protect them from their violent and abusive father, and to escape the stigma surrounding divorce at that time for a devoted Catholic.  Mr. Henriquez and his sisters were raised by his single mother, travelling back and forth between his mother's and grandmother's homes in Florida and the Dominican Republic, speaking Spanish at home and English outside the home.

Early on, Mr. Henriquez experienced tremendous learning difficulties (though he was not accurately diagnosed until he entered college).  He lagged behind his peers academically, struggled to perform at grade level, and was placed into special education classes.  His challenges started as early as the second grade, which he was forced to repeat, but his learning disabilities were never correctly diagnosed or treated, so he continued to struggle throughout his elementary, middle, and high school years.  During middle school, Mr. Henriquez was labeled "retarded," a common and grossly misused diagnosis in the 1970s, and attended a special education school for students with severe learning disorders.  This placed additional financial stress on his already struggling single mother.  Due to his mis-diagnosed learning difficulties, Mr. Henriquez struggled immensely in school and at home and suffered from depression, anxiety and withdrawal.  During this tumultuous period, Mr. Henriquez also experienced significant medical problems, including complicated

upper respiratory breathing issues. He spent weeks and, on occasions, months at a time living in the hospital due to respiratory issues, including bronchitis, and often slept in a cold, high-humidity, fully enclosed plastic breathing tent. Mr. Henriquez continues to suffer from serious breathing issues today.

Mr. Henriquez's mother eventually remarried in the hope of providing a better life to her children. But her new husband quickly revealed himself as an abusive, hot-tempered, alcoholic who beat Mr. Henriquez, his two sisters, their dog, and their mother. The stepfather commonly beat Mr. Henriquez with a dog leash or wooden paddle, showered him with incessant verbal abuse, and labeled him worthless and stupid due to his learning disabilities. A young Mr. Henriquez frequently had to call the police on his stepfather to stop his physical abuse of Mr. Henriquez's mother and two sisters. His mother finally found the courage to leave her abusive second husband. She had no income and temporarily relocated her children back to the Dominican Republic to live with their grandmother while she attempted to rebuild her life largely in the United States.

From a young age, Mr. Henriquez worked to support himself and his family. His family was poor. His mother worked as a store inventory clerk, making minimum wage and raising three children. To help his mother, Mr. Henriquez worked multiple jobs simultaneously, starting from the age of 10, to supplement his family's meager income. As an elementary and middle school student, Mr. Henriquez cut lawns, picked weeds (at 5 cents per weed), and sold mangos in a make-shift fruit stand at the end of their street. In high school, he worked seven days a week at multiple jobs—as a dishwasher and bus boy at a local restaurant, and later as a grocery store bag boy, supermarket stock boy, restaurant waiter, parking attendant, and employee at various retail stores and fast food restaurants. Most of his income went to his mother, to help support the family. She remained a steady presence in his life throughout his childhood, giving Mr. Henriquez and his two

sisters the support and direction they needed.  Mr. Henriquez had a tightly-controlled curfew and the family regularly attended catechism classes and church together as devoted Catholics.  Despite his heavy work schedule and significant academic challenges, Mr. Henriquez's mother encouraged him to enroll in his school's Junior Achievement entrepreneurship program so he could connect with male role models.  Mr. Henriquez did so, attending the program's national competition twice. After much struggle, Mr. Henriquez managed to graduate from his public high school, albeit with an extremely poor academic record due to his learning disabilities and undiagnosed dyslexia and dysgraphia.

Following graduation, and notwithstanding the challenges posed by his learning difficulties, Mr. Henriquez was determined to improve his life and decided that he would attend any college that would take him—he would be the first in his family to do so—in order to continue to help support his mother and sisters.  Mr. Henriquez chose to apply to Northeastern University because of its co-operative education program, which offered the opportunity to work while in school to offset educational costs.[2]  Despite his poor grades, Mr. Henriquez was accepted at Northeastern University under a specialized entry program for qualified incoming freshmen, called the Alternative Freshman Program.   This program offered conditional admittance to low performing high school graduates and sought to teach them the most basic college-level skills with the goal of preparing them for unconditional admission to the University after the first year in the program.  During his freshman entrance exam, a professor observed Mr. Henriquez's difficulty with reading and math, identified his learning disabilities, and concluded (for the first time in his life) that Mr. Henriquez suffered from dyslexia and dysgraphia.  Despite having spent 12 years in

---

[2] Northeastern's co-op program is an experiential learning model that provides students with real world experience. Students alternate each semester of academic study with periods of full-time work, providing students the opportunity to explore potential career paths, earn income, and acquire skills and knowledge necessary to successfully enter the workforce.

the U.S. educational system, this was the first time Mr. Henriquez had received this life-changing diagnosis and finally understood why school had been so overwhelmingly difficult for him. Northeastern transformed and saved Mr. Henriquez's life.  Under the close supervision of this Northeastern professor, Mr. Henriquez was re-trained to read and write, take notes, and learn various survival techniques to manage his dyslexia and dysgraphia.  Armed with this new training, Mr. Henriquez quickly embraced the opportunity to learn, to fulfill his desire to improve his life and for once perform at grade level—and he ran with it.  He attributes every bit of his subsequent professional and personal success to his good fortune in being conditionally admitted to Northeastern as a freshman and the skills that his Northeastern professors taught him to manage his learning disabilities.

Through Northeastern's co-op program, Mr. Henriquez learned job skills and made life-long professional contacts that prepared him to pursue a career in business and specialty finance. He worked multiple jobs throughout college, including as a barback/busboy and a retail store clerk (in addition to participating in the co-op program), and took on student loans and Pell Grants to complete his education and better his life.  Among other things, Mr. Henriquez started multiple creative entrepreneurial ventures during his time in college, including employing fellow students in word-processing businesses called WordWorks and Boston Professional Computers.  He also served in Northeastern's student government.  He graduated with a B.S. degree in Business Administration in 1987.

Through his internships and hard work at Northeastern, Mr. Henriquez was able to secure employment after graduation at Bank of Boston, where he had worked twice as a Northeastern co-op student  He quickly worked his way up within Bank of Boston and was asked to enroll in the Bank's highly-selective Loan Officer Development Program, where he received extensive training

in lending and financial analysis.  Mr. Henriquez sought to give back to his community during this time, serving as an advisor under the Boston chapter of Junior Achievement in order to assist inner city students like himself to develop an interest in business and attend college.

Eventually, after his mother's death from cancer, Mr. Henriquez found his way to the West Coast, working at Robertson, Stephens & Co., an investment bank where he was employed in the venture capital group.  After nearly three years, Mr. Henriquez left Robertson to join Comdisco Ventures, where he rose to President and Chief Investment Officer.   In December 2003, Mr. Henriquez founded his own company—Hercules Capital.  Hercules Capital went public in June 2005 and has funded nearly 400 growing companies with approximately $9 billion of capital, helping entrepreneurs realize their dreams, providing jobs to thousands of American workers at these companies, and advancing American innovation.  Hercules Capital realized Mr. Henriquez's vision of allowing "average" investors—those otherwise left out of exclusive investment opportunities—to participate in venture funding by investing in early stage companies (pre-IPO) through a publicly-traded stock.   Never forgetting his roots, Mr. Henriquez guided Hercules Capital for 16 years to play an active role in its community—the company provided up to two-weeks of annual paid leave to its employees to volunteer in their communities, matched employees' personal charitable donations in order to foster charitable giving, and supported many local charities.

### B.      Mr. Henriquez's Family

Mr. Henriquez met his wife Elizabeth ("Liz") in 1990 at a Bank of Boston continuing education event, while they were both employed there.  They married in 1997.  ████████████
███████████████████████████████████████████  Liz stopped working outside the home and focused on raising their daughters, while Mr. Henriquez continued to work hard to provide for

his family, including weekly business travel to the East Coast.  The relationship was a traditional one, with Mr. Henriquez responsible for providing financial support and Liz attending to household obligations and raising their two daughters.  Liz took charge of managing the girls' development, school enrollment, educational ▮▮▮▮▮ issues, ▮▮▮▮▮▮ social life, and ultimately the college application process.  Mr. Henriquez assisted when he could—coaching the girls' t-ball and soccer teams, attending meetings at his daughters' schools, and providing consistent emotional support and unconditional love, especially concerning the girls' own ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████

### C.     Aside from the Charged Offenses, Mr. Henriquez Has Lived an Exemplary, Charitable, and Ethical Life, and Always Strived to Better his Community

With the exception of the charged offenses, Mr. Henriquez has lived a life characterized by an extraordinary and constant effort to give back to and better his community.  Prior to his crime, Mr. Henriquez's life was an illustration of the American Dream.  An immigrant from a broken home who bounced between the Dominican Republic and the United States throughout his youth, Mr. Henriquez tirelessly worked his way up from a life of poverty, overcoming abuse and significant learning disabilities, to achieve extraordinary entrepreneurial success through sheer determination and hard work.  He enjoyed no privileged wind at his back.  And as a result, Mr. Henriquez never forgot where he came from or the obstacles he had to overcome.  In 1991, Mr. Henriquez elected to become a United States citizen and completed his naturalization in Boston. Reflecting his gratitude, Mr. Henriquez has devoted significant time to helping the less fortunate and, particularly, to assisting children with severe learning difficulties and life-threatening illnesses, as well as giving back to his *alma mater*, Northeastern University.  He is deeply grateful to all those who gave him the opportunity to achieve more than he could have dreamed possible, and he has relentlessly sought to give back to his community.

Forever thankful for the life he believed Northeastern made possible for him, Mr. Henriquez has always supported the Northeastern community and its students.  Mr. Henriquez financially supported the Torch Scholars Program for first-generation Northeastern students and funded a full scholarship, providing four-year tuition for a female Hispanic student in honor of his

mother.   In addition, for many years, Mr. Henriquez devoted significant time to helping Northeastern develop and expand its presence on the West Coast and hone its strategic initiatives. He has also consistently supported Northeastern's co-operative education programs by providing internships at Hercules Capital and encouraging others in his network to do the same.   Indeed, under Mr. Henriquez's leadership, Hercules Capital employed 8 to 12 Northeastern co-op students per year—approximately 110 co-op students in total—since Hercules' founding.  Many of these co-op students went on to become permanent employees of Hercules Capital.

Grateful for his financial success Mr. Henriquez has also been an active contributor to his local community.   He has been especially engaged in helping children facing severe learning disabilities, as he himself did, as well as children with significant medical and mental health problems.  Mr. Henriquez's philanthropic work includes the following:

### Lucile Packard Foundation for Children's Health

From 2012 to 2019, Mr. Henriquez served on the Board of the Lucile Packard Foundation for Children's Health, which supports the Lucile Packard Children's Hospital at Stanford and the child health programs associated with Stanford Hospital and Clinics.  During his time on the Board, Mr. Henriquez held multiple leadership positions, including Vice Chairman of the Board of Directors, Chair of the Compensation Committee, Member of the Executive Committee, Chair of the CEO Search Committee, and Member of the Investment Committee.  In all of these capacities, he devoted an extraordinary amount of time and energy to the organization.  With Mr. Henriquez's assistance, the Foundation raised over $3.5 billion in capital to erect the new Lucile Packard Children's Hospital, which opened in December 2017, and its many clinics, serving the needs of children with severe medical conditions.

Dr. David Alexander, the Former President and CEO of the Foundation, writes movingly about Mr. Henriquez's dedication to this very important cause: "Manuel was one of those extraordinary directors. He clearly joined the board for the right reasons and has a genuine passion for [a] compassionate approach to making sure that the kids we served got the best care possible." Ex. A, Tab 1. "One of the things I most appreciated about Manuel's counsel was that it seemed firmly rooted in a strong sense of institutional ethics and 'doing the right thing.'" *Id.*

**Children's Health Council**

From 2014 to 2019, Mr. Henriquez served on the Board of the Children's Health Council ("CHC"), a center that provides educational and medical services to children with severe mental health issues and learning disabilities, as well as to their families. CHC operates two schools for children who are forced out of school due to significant mental health concerns; provides psychiatric services to affected children and their families; and offers continuing education and training opportunities for educators, care providers, and families. For lower income families, CHC offers these programs at a low cost or for free. Mr. Henriquez held several leadership positions during his time on CHC's Board, including membership on the Board's Executive Committee, Chairman of the Finance Committee, Chairman of the Investment Committee, and Corporate Treasurer.

As explained by Dr. Rosalie Whitlock, CEO of CHC, Mr. Henriquez's leadership positions on the Board "relied heavily on his honesty, virtue, and outstanding judgement. In each role, he was completely trustworthy, dependable, and very principled." Ex. A, Tab 5. She notes that, "[e]ven though [Mr. Henriquez] was an extremely focused businessman and a very involved family man, he gave his time, expertise, wisdom, and strategic vision generously. . . . Manuel is a devoted and involved parent, a tireless community volunteer, and an advocate for kids with

challenges." *Id.*  Brian Dombkowski, who served with Mr. Henriquez on CHC's board, further notes that "[i]t takes a very special person to rise up from such humble beginnings, with such disadvantages, to achieve what he has achieved and to still give of himself as he has.  In my experience, people like Manuel are exceedingly rare in this world and extraordinarily valuable to society. . . . His leadership style empowers others and makes everyone around him want to rise up and do better." Ex. A, Tab 11.

### Charles Armstrong School for Dyslexic Children

From 2008 to 2011, Mr. Henriquez served on the Board of Trustees for the Charles Armstrong School, a special education elementary and middle school that serves children with dyslexia.



For Mr. Henriquez, his service as a Trustee marked the beginning of a lifetime commitment to serving children with learning challenges.  Around this time, for the first time in his life Mr. Henriquez began to publicly speak about his experience with dyslexia and his effort to manage his disability and achieve professional success.  Mr. Henriquez wanted to remove the shame of dyslexia and encourage children and families to embrace the future.  He was even featured in a *New York Times* article about this effort—showing that dyslexia is not insurmountable and inspiring affected children and parents to view dyslexia as an opportunity, not a death sentence. *See* Ex. B.[3]

As the former head of Charles Armstrong, Dr. Whitlock writes about Mr. Henriquez's service to the school: "Even though he hated public speaking, Manuel agreed to talk with groups

---

[3] Manuel Henriquez (as told to Patricia Olsen), "Ever the Entrepreneur," *The New York Times* (Sept. 23, 2007) (https://www.nytimes.com/2007/09/23/jobs/23boss.html).  Ex. B.

of children about how they, too, could overcome difficulties—just as he had done.  Throughout those years, I feel certain he changed the educational trajectory for many youngsters."  Ex. A, Tab 5.  This meaningful turning point has driven many of Mr. Henriquez's subsequent charitable endeavors.

In addition to donating much of his time to these philanthropic endeavors, Mr. Henriquez has been a long-time substantial financial supporter and fundraiser for the Ronald McDonald House of Palo Alto/Stanford, California, which provides accommodations, meals and other services to families of children receiving treatment at Stanford and Lucile Packard Children's Hospitals.  He supports and has built houses for Habitat for Humanity.  And he is a long-time financial supporter of Esperanza (a micro-lender helping poor women in Caribbean nations establish small businesses to support their families), the Canary Foundation (a foundation dedicated to raising cancer awareness, which he was inspired to support due to the loss of his mother to cancer), the Salvation Army, and many other charities.

Beyond his extraordinary commitment of time to these charitable purposes, Mr. Henriquez is a good person, friend, and family man.  Attached as Exhibit A are 41 letters submitted by friends, family, former co-workers and other associates of Mr. Henriquez.  As evidenced by these letters, and with the exception of his involvement in this case, Mr. Henriquez has lived a hard-working, fair, honest, sincere, and compassionate life:

- Mr. Henriquez is "a good person with [a] great heart, and a man who I'm proud to call [a] good friend for life."  Letter of Sassan Golafshan, Ex. A, Tab 8.

- Mr. Henriquez is "genuinely a wonderful human being."  Letter of Professor Janet S. McDaniel, Ex. A, Tab 9.

- "Manuel treated everyone with respect, especially the secretaries and younger analysts" at his company.  Letter of Ben Bang, Ex. A, Tab 13.

- "Above all, I would like to impress upon you that Manuel Henriquez is a good man with a kind heart, demonstrating a lifetime of caring and charitable intentions reaching

far outside of his own personal interests and needs." Letter of Monica Crawford, Ex. A, Tab 14.

- Mr. Henriquez has "always demonstrated transparency, integrity and honesty." Letter of Michael Hara, Ex. A, Tab 28.

The letters describe Mr. Henriquez as a supportive, loyal friend who puts the well-being of others ahead of his own:

- "He was my closest friend when I faced personal adversity including the loss of my father and step-mother in a car crash. When my wife was facing the darkest days of her life in a situation where many friends would turn their backs, Manuel was supportive, loving, caring. He encouraged me in my professional endeavors, coached me when I needed it and cajoled me when I needed that. His friendship and support has always been enduring, unwavering. That is who he is." Letter of Marc A. Friend, Ex. A, Tab 3.

- ███████████████████████████████████ Mr. Henriquez "was an incredible support. ████████████████████████████." Letter of Janet S. McDaniel, Ex. A, Tab 9.

- "There is no doubt that Manuel's generous and supportive traits helped save my life." Letter of Rebecca Friend, Ex. A, Tab 6.

- "Manuel has always 'stepped up to the plate' without a second thought." Letter of Maria F. Henriquez, Ex. A, Tab 12.

- "Whether in a professional or personal context, if Manuel offers his support or help, you can be assured he will be there for you." Letter of Roeland E. Boonstoppel, Ex. A, Tab 16.

And, at Hercules Capital, Mr. Henriquez led with integrity.

- Mr. Henriquez "emphasized and enforced strict compliance with all regulations and laws." Letter of Kathy Conte, Ex. A, Tab 2.

- Mr. Henriquez "always ran Hercules [Capital] with the utmost integrity and transparency." Letter of Ben Bang, Ex. A, Tab 13.

- "I was always impressed with [Mr. Henriquez's] integrity and honesty." Letter of David Lund, Ex. A, Tab 21.

- "I and all my colleagues have ALWAYS known Manuel to be honest and of high integrity in all his business dealings." Letter of Roy Thiele-Sardiña, Ex. A, Tab 24.

As the above amply demonstrates—apart from his crime—Mr. Henriquez has lived an inspirational life, characterized by hard work, a passion for entrepreneurship and the American Dream, devotion to his family and friends, and a dedication to philanthropy.

## II.     Mr. Henriquez's Crimes and Regret

Mr. Henriquez recognizes that he allowed himself to make a terrible choice—failing as a person and as a parent. Mr. Henriquez is deeply regretful and remorseful for his participation in this criminal activity. Mr. Henriquez recognizes that his actions were wrong and criminal, is fully aware of the severity and consequences of his actions, and takes full ownership of his participation, for which he is deeply sorry. He has submitted, in his own words, a letter to this Court that details his feelings and profound sense of shame and remorse. That letter has been filed herewith as Exhibit C.

Mr. Henriquez acknowledges that, in participating in Rick Singer's scheme, he held himself and his family above the rules that apply to the rest of society. He chose to cheat, which was morally wrong, unfair, unethical, and illegal. Mr. Henriquez's illegal conduct has upended his daughters' lives and profoundly damaged his family, marriage, and career. Mr. Henriquez recognizes that the victims of his crime are the hard-working students who played by the rules and did not attempt to secure college admission through cheating, as well as the universities that received false application information regarding his children. The integrity of the educational system as a whole has suffered. He is full of shame and remorse as a result of his actions.

Personally, and very painfully, he recognizes that he has been a terrible role model to his children and his community. He built himself and his business on hard work and impeccable ethics and has strived to impart these values to his two daughters since they were young. His conduct in this scheme has ruined that legacy, undermined those lessons, and destroyed the trust he shared

with his children.  He recognizes that this situation is entirely of his own making.  He looks back at his conduct with disgust and shame, and he deeply regret his actions and seeks atonement for the hurt he has caused.

Mr. Henriquez has learned a profound and deeply important lesson throughout this process. He will work every day to atone for his illegal conduct.  He looks forward to restarting his life and once again contributing to his community and helping those less fortunate than himself.

### III.   A Sentence at the Low End of the 0- to 6-Month Guidelines Range Meets the Objectives of the Sentencing Guidelines and Relevant Statutory Authority

Mr. Henriquez respectfully requests that the Court impose a sentence at the low end of the 0- to 6-month Guidelines range, as such a sentence would be "sufficient, but not greater than necessary" to meet the objectives of the federal sentencing system.  18 U.S.C. § 3553(a).

### A.   Guideline 2B1.1 Applies and Probation Correctly Determined Mr. Henriquez's Sentencing Guidelines Range to be 0 to 6 Months

The four courts in this District to have considered the issue (this Court, Judge Talwani, Judge Woodlock and Judge Zobel) agree with Probation that Sentencing Guideline 2B1.1 applies to the conduct at issue.[4]  Because the offense caused no financial loss or gain, these courts have further held that no offense level enhancement on this ground should apply.[5]

Where, as here, a defendant is convicted of two charges stemming from the same course of conduct, the applicable offense level is the higher of that applicable to each charge.  U.S.S.G.

---

[4] *See United States v. MacFarlane*, 19-cr-10131 (NMG), 11/18/2019 Tr. at 4, Dkt. 340; *United States v. Hodge*, 19-cr-10080 (NMG), 2/7/2020 Tr. at 4, Dkt. 840; *United States v. Janavs*, 19-cr-10080 (NMG), 2/25/2020 Tr. at 5, Dkt. 872; *United States v. Vandemoer*, 19-cr-10079 (RWZ), 6/12/19 Tr. at 17, Dkt. 26; *United States v. Abbott, et al.*, 19-cr-10117 (IT), 10/8/2019 Tr. at 4-6, Dkt. 443; *United States v. Bizzack*, 19-cr-10222 (DPW), 10/30/2019 Tr. at 62, Dkt. 34.

[5] Despite judicial unanimity on the issue, the government persists in its claims that Guideline 2B4.1 applies and that the offense level should be significantly enhanced for monetary loss or gain based on the amount of each defendant's payment(s).  If ambiguous before, the applicability of Guideline 2B1.1 is now clear.  The government's insistence on pressing an argument that has been rejected by all courts to have considered the issue is difficult to understand.

§§ 3D1.2, 3D1.3(a).  Because the adjusted offense level applicable to Count 1 (18 U.S.C. § 1349) is 7, and that applicable to Count 2 (18 U.S.C. § 1956(h)) is 8,[6] Mr. Henriquez's adjusted offense level is 8—the higher of the two.  After receiving a two-level downward adjustment for acceptance of responsibility, his total adjusted offense level is 6.  This yields a Guidelines range of 0 to 6 months.

## B.       Mr. Henriquez Played A Relatively Minor Role in the Offense

The government's sentencing memo[7] portrays Mr. Henriquez as having played a significant and "active" role in the crime, claiming that he abused positions of trust to further the offense and involved his children in the scheme, and noting that he and his wife took a tax deduction for the sports payment to Singer's foundation.  These factors do not warrant a sentence of five months' imprisonment, as the government requests.

### 1.       Mr. Henriquez Did Not Abuse A Position of Trust

Arguing that Mr. Henriquez "abused a position of trust" in committing the offense, the government points out that, at the time of the offense, he served as "the chief executive of a publicly traded company—whose job[] entailed responsibilities to investors, employees, and business counter-parties" and had formerly served as a member of the Northeastern University Corporation and remained a "prominent alumnus."  Govt. Memo at 23.  As the government

---

[6] The government disputes Probation's calculation of the adjusted offense level for Count 2, the money laundering conspiracy charge under 18 U.S.C. § 1956(h), claiming that Probation incorrectly has given Mr. Henriquez and the other parents an unwarranted benefit of one offense level.  As the Court recognized when sentencing defendants Douglas Hodge and Michelle Janavs, the government is wrong.  Mr. Henriquez need not repeat these arguments here.

[7] As referenced hereinafter, "Govt. Memo" refers to the "Government's Consolidated Sentencing Memorandum" regarding the sentencing proceedings of Douglas Hodge, Michelle Janavs, Elizabeth Henriquez and Manuel Henriquez, filed on February 3, 2020 in this matter. Dkt. 816.  The government has indicated to Mr. Henriquez's counsel that it will revise its original 18 month sentencing request and no longer seek upward departures and variances, but it will not withdraw the February 3, 2020 memorandum.  Accordingly, Mr. Henriquez addresses the memorandum's factual arguments here.

explains, these positions "came with heightened responsibilities," as Mr. Henriquez "purported to be [a] leader and role model[]." *Id.*

Mr. Henriquez's role a chief executive of a public company and his former membership in the Northeastern University Corporation had nothing to do with the offense. Indeed, Judge Talwani chastised the government for making a similar argument at the sentencing of Gordon Caplan, the former law firm chairperson (noting that Caplan "engaged in this offense as a person, not as a chairman of one of the world's largest law firms"—"with regard to the nature of the crime, it's not a factor"). *United States v. Caplan*, 19-cr-10117 (IT), 10/3/2019 Tr. at 43, 45, Dkt. 515.

The same holds true for his alleged status as a Northeastern alumnus. Like many university alumni, Mr. Henriquez periodically interviewed high school students on the West Coast who wished to learn about and possibly apply to Northeastern. He did this for many students, for well over a decade. He sometimes recommended them for admission to the university and sometimes did not. At Singer's request, Mr. Henriquez interviewed a Singer student who planned to apply to Northeastern. Mr. Henriquez liked the student and saw an opportunity for the student's father, ███████████████████████████████ to offer an expansion of Northeastern's co-op internships in Southern California, where the university had few co-op corporate sponsorships. Accordingly, he recommended the student for admission. He did not guarantee admission to that student, nor could he, as he did not have that authority. Mr. Henriquez does not recall an agreement with Mr. Singer to forgive an invoice. Rather, he recalls simply doing what he has done for numerous Northeastern applicants, as a favor to Singer and the applicant, and to further Northeastern's goal of expanding its co-op program more significantly in Southern California. Mr. Henriquez's interview and recommendation of this student is not part of the offense, and it should not increase his sentence.

### 2.      Mr. Henriquez Did Not Recruit His Children into the Scheme

Despite claiming generally that Mr. Henriquez "recruit[ed] his children" into the scheme, the government offers no facts to support this.  Govt. Memo at 22-23.  Its only arguable reference to Mr. Henriquez is the statement that: "Singer specifically informed the Henriquezes that he had directed their [] daughter to draft 'a new absolutely BS great story about her origin,' that was later submitted to [the university], where she eventually enrolled."  *Id.* at 22 (quoting an email from Singer to Ms. Henriquez, on which Mr. Henriquez was copied).  This email in no way suggests that Mr. Henriquez "recruit[ed]" his children into to the scheme, as the government claims.  Further, the government cites no evidence that Mr. Henriquez ever read the email, replied to the email, discussed the email with anyone, or was otherwise aware of its contents.  It is simply not true that Mr. Henriquez recruited his children into Singer's scheme.

### 3.      Mr. Henriquez Did Not Play An "Active Role" in the Offense

The government also inaccurately claims that Mr. Henriquez was an "active" and "repeat" participant in the unlawful conduct.  Govt. Memo at 18.  Mr. Henriquez's role in the offense was minor.  He did not interview or hire Singer, did not email, text, or have phone conversations with Singer about matters relevant to this case, was not involved in decisions or arrangements related to his daughters' testing, did not accompany his children when they took those tests, did not review their college applications or essays, although he knew that the applications contained  fraudulently obtained test scores, and did communicate in any way with the college tennis coach.  Mr. Henriquez knew some but not all of the details of the scheme with Singer, played a small role, and to his great regret and shame, did not stop it.  He paid Singer's bills, as he did all the family's bills.  And as many college alumni would do, he interviewed and recommended a Singer student in connection with that student's interest in and application to Mr. Henriquez's alma mater,

Northeastern University, as he had done for many other prospective students in the past (without any ability to determine admissions).   Indeed, Mr. Henriquez's role was akin to the least culpable parents charged in connection with this matter (as discussed in more detail below).

**4.      The Tax Deduction Does Not Evidence Enhanced Culpability**

The government makes much of the fact that the Henriquezes, like multiple other parent defendants, recorded a deduction on their federal tax returns for amounts paid to Singer's registered 501(c)(3) charity, the Key Worldwide Foundation.  In Mr. Henriquez's case, and as he described in his change of plea hearing, he understood from Singer that the Key Foundation made financial donations to underfunded college athletic programs (including Georgetown tennis) and programs for disadvantaged youth, and that his $400,000 sports payment to the Key Foundation would be used for this purpose.

In order to confirm what Singer had told him, and prior to making his payment to the Key Foundation, Mr. Henriquez reviewed publicly-available IRS Forms 990 filed by the organization.[8] The Forms 990 indicated that the Key Foundation was a tax-exempt 501(c)(3) non-profit organization that used its funds, *inter alia*, to "contribut[e] to major athletic university programs [in order to] help to provide placement to students that may not have access under normal channels."[9]  The 2014 Form 990 reported that the Key Foundation made financial contributions to

---

[8] Mr. Henriquez accessed these materials through the GuideStar and/or California Office of the Attorney General websites.  The 990 tax forms continue to reside online in multiple locations.

[9] Key Worldwide Foundation, 2014 IRS Form 990 (Schedule I) (accessed 7/17/2020), https://projects.propublica.org/nonprofits/display_990/461603030/2015_07_EO%2F46-1603030_990_201412. *See also* Key Worldwide Foundation, 2015 Form 990 (Schedule I) https://projects.propublica.org/nonprofits/display_990/461603030/2017_04_EO%2F46-1603030_990_201512 (accessed 7/17/20) (reporting donations to Baruch College, Chapman University, City of Houston, DePaul Religious Studies, NYU athletics, Loyola High School, U. of Texas athletics, USC soccer program, USC water polo, USC women's athletics, USC women's volleyball, Yale summer sports); Key Worldwide Foundation, 2016 IRS Form 990 (Schedule I) https://apps.irs.gov/pub/epostcard/cor/461603030_201612_990_2018010815095446.pdf (accessed 7/17/20) (reporting donations to Chapman University, DePaul University, NYU, U. of Miami, U. of Texas athletics, USC soccer, and USC Women's Athletics Board).

multiple university-level sports and academic programs, including New York University athletics, University of Southern California ("USC") water polo, USC baseball, USC women's soccer and the DePaul Religious Studies Department.

After confirming the Key Foundation's status and charitable purpose, Mr. Henriquez made the payment. The payment was reflected on the Henriquezes' 2016 tax return as a contribution to an organization eligible to receive tax-deductible charitable donations.

Following revelations in the March 2019 criminal complaint that Singer's foundation was a fraud, Mr. Henriquez quickly took steps to amend his 2016 tax return to remove the donation to the Key Foundation. He filed the amended return later that year and paid the amount due with penalties and interest. Notably, the Key Worldwide Foundation today continues to be listed on the IRS website as an organization eligible to receive tax-deductible charitable contributions.[10]

Mr. Henriquez is certainly not backing away from responsibility for his criminal conduct. But punishing him further, based on the manner in which his tax return reflected the transaction, is not warranted under the circumstances.

### C.    Mr. Henriquez Has Fully Accepted Responsibility for his Conduct

The government suggests in its memo that Mr. Henriquez has not adequately accepted responsibility for his crime. It highlights his refusal to immediately plead guilty following his arrest, and notes that he chose to wait and review some of the government's discovery materials before deciding how to proceed. Govt. Memo at 2 ("Unlike the defendants who have been sentenced to date, these defendants waited to accept responsibility for their crimes until months after they were indicted, and after they had a chance to review the overwhelming evidence of their guilt."). The government further claims, inexplicably, that Mr. Henriquez continues to deny

---

[10] https://www.irs.gov/charities-non-profits/tax-exempt-organization-search-bulk-data-downloads (accessed 7/17/20).

responsibility for the money laundering.  *Id.* at 10, n. 9.  The government is wrong—Mr. Henriquez has demonstrated full acceptance of responsibility.

Upon receiving a telephone call from the FBI on the morning of March 12, 2019 (he was in New York on a business trip), Mr. Henriquez immediately turned himself in to the nearest U.S. Marshal's Service office in the Southern District of New York.  Within hours of his release, and with an understanding of the seriousness of this situation, Mr. Henriquez called an emergency board meeting of his company, voluntarily ceased day-to-day operational control, and resigned from his role as Chair of the Board of Directors (thereafter fully resigning from the Board).[11]  He also stepped down from his board positions at the Lucile Packard Foundation for Children's Health and the Children's Health Council in order to avoid burdening the organizations with the stigma from his arrest.  Mr. Henriquez did not enter a guilty plea immediately but elected (as he is fully entitled to do) to review select portions of the government's discovery materials.  He made the decision to enter a guilty plea long before discovery was complete, and he pleaded guilty in October 2019—seven months after being charged and well in advance of trial.  Mr. Henriquez's choice to review a limited amount of discovery, rather than immediately pleading guilty, is within his rights and does not indicate a failure to accept responsibility.

Aside from its lack of factual support, any variance for Mr. Henriquez's alleged failure to accept responsibility would be contrary to the Guidelines, which already contemplate denial of acceptance points in appropriate circumstances.  U.S.S.G. § 5K2.0(d)(2) (barring the Court from departing or varying based on the defendant's acceptance of responsibility, "which may be taken into account *only* under §3E1.1 (Acceptance of Responsibility)" (emphasis added)).

---

[11] Subsequently, Mr. Henriquez resigned from the company and he no longer plays any role there.

### D.  Mr. Henriquez's Sentence Should Account for His Lifetime of Charitable Works

This Court should consider the extent to which Mr. Henriquez's lifetime of meaningful charitable work counterbalances the need to punish him more severely.  Other than the charged offenses, and as detailed above, Mr. Henriquez has lived an exemplary, ethical, and hard-working life, always seeking ways to re-pay his community.  He recognizes the strong hand up he received, allowing him to move beyond a childhood marred by abuse, poverty, and educational setbacks, and has sought to extend that hand to others.  Mr. Henriquez's commitment to charitable works, including an enormous dedication of his personal time and energy (not merely financial donations), should not be overlooked.  His significant charitable endeavors are presented in more detail in Section I(C) above (pp. 8-14).

### E.  Mr. Henriquez's Sentence Should Accord with Those Imposed Upon Other Similarly-Situated Defendants

A sentence at the low end of the 0- to 6-month range is appropriate to meet statutory objectives.[12]  In imposing sentence, the Court must seek to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  The First Circuit has recognized the need to "align codefendants' sentences somewhat in order to reflect comparable degrees of culpability" and avoid situations where "disparities are conspicuous and threaten to undermine confidence in the criminal justice system."[13]

---

[12] The sentence imposed must be "sufficient, but not greater than necessary," to "reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense; [] to afford adequate deterrence to criminal conduct; [and] to protect the public from further crimes of the defendant . . . ." 18 U.S.C. § 3553(a)(2).

[13] *United States v. Martin*, 520 F.3d 87, 94–95 (1st Cir. 2008) (rejecting the government's claim that, in sentencing defendant, district court should not have considered the relative length of coconspirators' sentences); *see also United States v. Reyes-Santiago*, 804 F.3d 453, 473 (1st Cir. 2015) (remanding to district court and finding defendant's sentence "substantively unreasonable and, hence, an abuse of discretion, because of its substantial disparity with the sentences given to co-defendants and the absence of any identified, supportable basis for the inconsistency."); *United*

The underlying crime—paying for improper assistance on standardized tests and preferential athletic admissions slots—is essentially the same for all parents charged in this and related cases.  Accordingly, Mr. Henriquez should be sentenced consistently with the sentences imposed on parents with similar levels of culpability and involvement.[14]

Mr. Henriquez's participation was minor and largely passive, as he was running a growing public company while Ms. Henriquez devoted herself to the care and well-being of their children.  Mr. Henriquez did not originate, orchestrate or lead the efforts with Singer.  He was aware that there was cheating with respect to his daughters' college entrance exams and that the test results would be sent to the universities as part of the admissions process, and he paid the bills.  But he did not know the details and was not involved in carrying them out.  He believed the $400,000 payment to Singer's Key Foundation would be donated to the Georgetown tennis program and disadvantaged youth and would help to assure his daughter's admission to the school.  Unlike nearly every other defendant, Mr. Henriquez had very little contact with Singer and did not play an active role.

The government's original sentencing recommendations—18 months for Mr. Henriquez and 26 months for Ms. Henriquez—reflect the government's understanding and belief that Mr. Henriquez played a significantly lesser role in the offense.  And as acknowledged by Ms. Henriquez through her attorneys, Ms. Henriquez "blames herself for what she has brought upon"

---

States v. Rivera-Lopez, 736 F.3d 633, 636 (1st Cir. 2013) ("When 'identically situated defendants' receive significantly disparate sentences, red flags may indeed be raised.").

[14] Judge Talwani and Judge Woodlock both recognized the need to consistently sentence the parents and avoid unwarranted disparities.  See, e.g., United States v. Klapper, 19-cr-10117 (IT), 10/16/2019 Tr. at 32, Dkt. 573 (the court expressed its intention to "avoid unwarranted sentencing disparities among the defendants who are here before me and have been found guilty of similar conduct."); United States v. Bizzack, 19-cr-10222 (DPW), 10/30/2019 Tr. at 109, Dkt. 34 (it is "[p]robably as corrosive as anything that can happen in the criminal justice system to have disparate sentences"); United States v. Huneeus, 19-cr-10117 (IT), 10/4/2019 Tr. at 23, Dkt. 551 ("I have an obligation to try and not sentence defendants differently for the same offense.").

Mr. Henriquez and their daughters. *United States v. Elizabeth Henriquez*, 19-cr-10080 (NMG), 3/31/20 Tr. at 23, Dkt. 1030.

In contrast to Mr. Henriquez, each of the parents detailed below was far more deeply involved in the misconduct. And each received (or the government now recommends) a prison sentence equal to or lower than the five-month term that the government recommends for Mr. Henriquez.

| Parent | Facts related to Role | Sentence |
|--------|----------------------|----------|
| Agustin Huneeus | • Personally orchestrated the entire scheme for his family. No other parent alleged to be involved. Cpt.[15] at ¶¶ 221-41.<br><br>• Extensive communication with Singer regarding the details and objectives of the scheme, including the false presentation of his daughter as a water polo recruit, even though she was not qualified to be recruited. *Id.* at ¶¶ 223-24, 226-27, 231-33, 235-36. Sought assurance from Singer that his daughter would not actually be expected to play water polo. *Id.* at ¶ 237.<br><br>• Urged Singer to "make things happen," and asked how he could cheat more. *United States v. Huneeus*, 19-cr-10117 (IT) 10/4/2019 Tr. 8, 13, Dkt. 551.<br><br>• Offered to have his older daughter take the ACT on behalf of his younger child. Mr. Huneeus came up with this "original idea" (his words) on his own. *Id.* at 9.<br><br>• "[A]sked his daughter to write a fake e-mail to USC that would say that she was going to be an athlete when she joined[,] and a capable one at that." *Id.* at 9. Hounded her for six months for a water polo photo to include in the fake athletic profile. *Id.* at 15; Cpt. at ¶ 233.<br><br>• Repeatedly directed his daughter to participate in and advance the scheme. Tr. (10/4/19) at 10, 15. Directed his daughter to keep a "shut-your-trap mentality" about the fraud. *Id.* at 16. | 5 months |

---

[15] "Cpt." refers to the Criminal Complaint filed in *United States v. Abbott, et al.*, 19-mj-06087 (MPK) (3/11/19), filed as Dkt. 3 under case 19-cr-10080 (NMG).

| Parent | Facts related to Role | Sentence |
|---|---|---|
| | • Fabricated a story for administrators at daughter's high school to explain why she would be taking her standardized test in Los Angeles.  Cpt. at ¶ 226.<br><br>• Arranged for improper payments to Singer's foundation. *Id.* at ¶¶ 229, 240.<br><br>• Complained to Singer that the cheating was not good enough and his daughter should have gotten a higher score. *Id.* at ¶ 230. | |
| Michelle Janavs | • Personally orchestrated the entire scheme for her family.  No other parent alleged to be involved. *Id.* at ¶¶ 379-99.<br><br>• Strategized with Singer about how to hide the USC sports payment from the USC development team.  Govt. Memo at 9-10.<br><br>• Provided information to Singer to facilitate daughter's admission to USC as a beach volleyball recruit, even though she did not play beach volleyball, including sending photographs for false athletic profile.  Cpt. at ¶¶ 386-87.<br><br>• Arranged for improper payments to Singer's foundation and USC women's athletics. *Id.* at ¶¶ 384-85, 392, 397, 399.<br><br>• Schemed with Singer about how to avoid alerting younger daughter to test cheating. *Id.* at ¶ 393.<br><br>• Arranged to move daughter's ACT testing to a Singer-controlled facility in Los Angeles.  Govt. Memo at 8. | 5 months |
| Mossimo Giannulli | • More actively involved of the two parents in the family (as compared to spouse Lori Loughlin).  Cpt. at ¶¶ 194-220.<br><br>• Discussed with Singer that his daughter's qualifications for USC were on the "low end," and that she therefore should seek admission through crew, although she did not actually participate in crew. *Id.* at ¶ 198.<br><br>• Communicated regularly with Singer throughout execution of the scheme. *Id.* at ¶¶ 194-220.<br><br>• Sent Singer photos of both of his daughters on a rowing machine to use in connection with their fraudulent recruitment to USC as athletes. *Id.* at ¶¶ 199, 209. | 5 months (recommended by gov't in plea agreement[16]) |

---

[16] *United States v. Giannulli,* 19-cr-10080, Dkt. 1218 (plea agreement).

| Parent | Facts related to Role | Sentence |
|--------|----------------------|----------|
|  | • Arranged for improper payments to USC coach and Singer. *Id.* at ¶¶ 201-202, 204-205, 212, 215. |  |
| Todd Blake | • Registered his daughter with the NCAA Eligibility Center, knowing that she did not play collegiate-level volleyball. *Id.* at ¶ 438, 447.<br><br>• Actively sought out Singer's assistance for his son's admission, following improper admission of his daughter. *Id.* at ¶ 443.<br><br>• Arranged for improper payments to USC athletics and Singer's foundation. *Id.* at ¶¶ 439, 442.<br><br>• Misled USC fundraisers regarding the nature of his payments. *Id.* at ¶ 446. | 4 months (recommended by gov't in plea agreement[17]) |

Mr. Henriquez's role in the offense was far less significant than that played by any of these parents. His sentence should reflect that role.

## IV.   Mr. Henriquez's Sentence Should Reflect His Unique Health Circumstances

Finally, in fashioning Mr. Henriquez's sentence, the Court should consider Mr. Henriquez's unique and severe health issues, which will be dangerously exacerbated by any period of incarceration during the coronavirus pandemic, leaving him at an extraordinarily high risk of complications and death. *See*, *e.g.*, U.S.S.G. § 5H1.4 (providing for downward departure based on a defendant's unique physical condition that "distinguishes the case from the typical cases covered by the guidelines."). Mr. Henriquez suffers from many CDC-listed pre-existing medical conditions, including chronic lung problems, stage 2 hypertension (high blood pressure), clinical obesity, and pre-diabetes, all of which put him into the "high risk" category as defined by the CDC

---

[17] *United States v. Todd Blake*, 19-cr-10080, Dkt. 1379 (plea agreement).

and differentiate him from "typical cases" covered by the guidelines.[18]  PSR ¶¶ 127-28; Ex. D (Letters from Dr. Stuart Schlisserman and Dr. Richard Goldberg).

According to the Coronavirus Survival Rate Calculator, Mr. Henriquez has a 46.64% chance of death if he were infected with the coronavirus, in light of his age, gender and current medical conditions (hypertension, diabetes and chronic respiratory disease).[19]  In contrast, a man of Mr. Henriquez's age without any pre-existing medical conditions would face just a 2.65% chance of dying from the coronavirus, were he to contract it.[20]  In other words, Mr. Henriquez's risk of death is 1,760% higher, due to his medical conditions, than that faced by a similarly-situated yet healthy defendant of his age.

As the court is no doubt aware, the risk of contracting coronavirus in prisons is exponentially higher than in the general population.[21]  If Mr. Henriquez is sentenced to prison, he risks a death sentence.  And the longer his sentence, the greater the chance that he becomes infected.  Although he does not ask for or expect a sentence of home confinement, he respectfully asks that the Court take his unique medical condition into consideration in fashioning his sentence.

## V.    Mr. Henriquez Requests that He and His Wife Elizabeth Serve Staggered Sentences

Regardless of the sentence imposed upon him, Mr. Henriquez respectfully requests that this Court order his sentence staggered with that currently being served by his wife, Elizabeth

---

[18] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[19] https://ncov2019.live/calculator.

[20] *Id*.

[21] In American jails and prisons, more than 90,000 people have been infected and at least 738 inmates and correctional officers have died.  https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html; *see also* https://eji.org/news/covid-19s-impact-on-people-in-prison/ (noting that most of the largest outbreaks in the country have been at correctional facilities).  Even the CDC has recognized that "[p]eople in correctional and detention facilities are at a greater risk for some illnesses, such as COVID-19, because of close living arrangements with other people."  https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html.  These impacts are exacerbated by the lack of quality healthcare available to inmates.

Henriquez.  The government has advised that it has no objection to this request. ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ Accordingly, Mr. Henriquez asks that the sentences be

staggered,[22] and asks that his report date be set for at least two weeks after Ms. Henriquez's

scheduled release on January 27, 2021.

## VI.    Conclusion

Mr. Henriquez is profoundly sorry, ashamed, and remorseful for his illegal actions—for

the hurt and damage he has inflicted upon his family, for the harm he has brought to the honorable

students who apply to college on their own merits, and for the tremendous damage to the broader

college admissions system.  Mr. Henriquez is wracked with shame and regret—he has hurt so

many others, and he has lost his job, his career, his company, many friends, and his self-respect.

He will certainly never commit a crime again, and he is fully prepared to spend time in prison to

---

[22] For the other two married defendants to have been sentenced thus far (Gregory and Marcia Abbott), Judge Talwani granted a similar request, directing staggered sentences. *United States v. Abbott*, 19-cr-10117 (IT), 10/8/2019 Tr. at 62, Dkt. 443.

further atone for his crimes.  For the reasons set forth above, Mr. Henriquez submits that a sentence

near the low end of the 0- to 6-month Guideline range is just and appropriate.

Dated:  July 22, 2020                                Respectfully Submitted,
                                                     MANUEL HENRIQUEZ,
                                                     By His Attorneys:


                                                     */s/ Melinda Haag*
                                                     Melinda Haag (admitted *pro hac vice*)
                                                     Walter F. Brown, Jr. (admitted *pro hac vice*)
                                                     Robin A. Linsenmayer (admitted *pro hac vice*)

                                                     Orrick, Herrington & Sutcliffe, LLP
                                                     405 Howard Street
                                                     San Francisco, CA 94015
                                                     (415) 773-5700

                                                     mhaag@orrick.com
                                                     wbrown@orrick.com
                                                     rlinsenmayer@orrick.com

**CERTIFICATE OF SERVICE**

I, Melinda Haag, hereby certify that on July 22, 2020, Manuel Henriquez's Sentencing Memorandum and supporting exhibits, were filed through the CM/ECF filing system, and will be sent electronically to all registered participants in this matter as identified on the Notice of Electronic Filing (NEF).

*/s/ Melinda Haag*

MELINDA HAAG
